UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| ESTHER NAOMI LIEBERMAN on Behalf of Herself and All Others Similarly Situated,<br><br>Plaintiff,<br>v.<br><br>THE HERSHEY COMPANY; MARS, INCORPORATED; MASTERFOODS USA; NESTLE S.A.; NESTLE USA; CADBURY SCHWEPPES PLC; CADBURY SCHWEPPES AMERICAS; CADBURY ADAMS USA LLC,<br><br>Defendants. | CIVIL ACTION NO.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL ANTITRUST LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff, by and through her attorneys, brings this civil action against the above named defendants (collectively, "Defendants") for damages under the Sherman Antitrust Act. Based on personal knowledge with respect to herself and her own actions, and on information and belief based upon *inter alia*, the investigation by counsel, Plaintiff alleges as follows:

### NATURE OF ACTION

1. This case arises from an international cartel among the world's leading manufacturers of chocolate, beginning no later than December 21, 2003, and continuing until at least November 21, 2007, to fix, raise, maintain and stabilize prices of chocolate in the worldwide chocolate market, including in the United States.

2. Chocolate is a confectionery product created by processing cocoa beans and mixing the processed beans with milk, sugar, and other ingredients. As used in this complaint, "Chocolate" means and includes, at least, chocolate bars, industrial chocolate (melted and powdered chocolate made after processing cocoa beans sold to create a final product), and block

chocolate (solid chocolate blocks made for immediate consumption and for melting down to make desserts and molded chocolate products).

3. The worldwide market for Chocolate is highly concentrated, with Defendants together controlling almost 50 percent of that market.

4. Defendants' market power in the United States is even greater. Hershey, Mars, Cadbury, and Nestle (defined below) control over 80 percent of the chocolate market in the United States.

## PARTIES

5. Plaintiff Esther Naomi Lieberman, who resides in Brooklyn, New York, purchased Chocolate directly from one or more of the Defendants and was damaged as a result of Defendants' unlawful conduct.

6. Defendant The Hershey Company ("Hershey") is a Delaware corporation headquartered at 100 Crystal A Drive, Hershey, PA 17033. Hershey is the top-selling manufacturer of Chocolate in the United States and accounts for 45 percent of the U.S. Chocolate market. Its revenues in 2006 were $4.9 billion, with $305.6 million net income and a profit margin of approximately 7.1 percent. It employs over 14,000 employees worldwide. During the Class Period, Hershey, directly or through its subsidiaries of affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

7. Defendant Mars, Incorporated ("Mars") is a privately held corporation entirely owned by the Mars family and headquartered at 6885 Elm Street, McLean, Virginia 22101. Mars is a worldwide manufacturer of Chocolate, amongst other products, which in 2006 had revenues of $21 billion. During the Class Period, Mars directly or through its subsidiaries or

affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

8. Defendant Masterfoods USA ("Masterfoods") is headquartered at 800 High Street, Hackettstown, NJ 07840. Masterfoods conducts Mars's U.S. food, snack and petcare operations. Masterfoods employs more than 7,000 employees in the U.S., and has fifteen U.S. manufacturing plants. Its annual sales exceed $5 billion. During the Class Period, Masterfoods directly or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

9. Defendants identified in paragraphs 7 and 8 are collectively referred to herein as "Mars."

10. Defendant Nestle S.A. is a Vevey-Switzerland based multinational packaged food company that manufactures confectionery products, including Chocolate, among other products. It is headquartered at Avenue Nestle 55, CH-1800, Vevey, Vaud, Switzerland. In 2006, its revenue was approximately $87 billion and net income approximately $4.5 billion. It employs over 300,000 employees. During the Class Period, Nestle S.A. directly, or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

11. Defendant Nestle USA is a Delaware corporation with is principal place of business at 800 N Brand Boulevard, Glendale, CA 91203. Nestle USA had sales of $8.5 billion in 2006. It employs over 15,500 employees nationwide, and has twenty manufacturing facilities, five distribution centers, and twelve sales offices across the country. During the Class Period, Nestle directly or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

12. Defendants identified in paragraphs 10 and 11 are collectively referred to herein as "Nestle."

13. Defendant Cadbury Schweppes plc is a confectionery and beverage company headquartered at 25 Berkeley Square, London, W1J6HB, UK. With over 59,000 employees, its revenues were approximately $15 billion and its net income exceeded $2 billion in 2006. Cadbury Schweppes plc sells is products in the U.S. through a licensing agreement with Hershey. During the Class Period, Cadbury Schweppes plc directly or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

14. Defendant Cadbury Schweppes Americas is headquartered in 5301 Legacy Drive, Plano, Texas 75024. During the Class Period, Cadbury Schweppes Americas directly or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

15. Defendant Cadbury Adams USA LLC, headquartered at 389 Interpace Parkway Ste 1, Parsippany, New Jersey 07054, is Cadbury's Schweppes's confectionery unit in the United States. During the Class Period, Cadbury Adams USA LLC directly or through its subsidiaries or affiliates, manufactured and sold Chocolate to customers at anticompetitive prices which were inflated by reason of Defendants' unlawful conduct.

16. Defendants identified in paragraphs 13 through 15 are collectively referred to herein as "Cadbury."

**UNNAMED CO-CONSPIRATORS**

17. On information and belief, other Chocolate manufacturers, John Does I-X, are co-conspirators with Defendants in their unlawful restraint of trade. These other co-conspirators have facilitated, adhered to, participated in, and/or communicated with others regarding the

conspiracy. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade.

## JURISDICTION AND VENUE

18. This action arises under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

19. Jurisdiction of this Court is founded on Section 15 of the Sherman Act, 15 U.S.C. § 15, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15, and 28 U.S.C. §§ 1331, 1337.

20. Venue as to Defendants is proper in the Eastern District of Texas, pursuant to Sections 15(a) and 22 of the Sherman Act, and 28 U.S.C. § 1391(b), (c), because Defendants are found and transact business in the Eastern District of Texas and/or the claims arose at least in part in the Eastern District of Texas. Defendants regularly and continuously conduct business in interstate and foreign commerce between and among the United States and foreign countries. The interstate trade and commerce described herein has been carried out, in part, within the Eastern District of Texas.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of herself and the class (the "Class"), defined as:

> All persons or entities residing in the United States who purchased Chocolate directly from the Defendants or their co-conspirators at any time from December 21, 2003, through November 21, 2007 (the "Class Period"). Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators.

22. The Class consists of many thousands of persons and is so numerous and geographically dispersed that joinder of each of the members of the Class would be impracticable. While the exact number of Class members is unknown to Plaintiffs at this time,

Plaintiffs believe that there are, at least, thousands of members of the Class and that their identities can be learned from Defendants' and their co-conspirators' books and records.

23. Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff and members of the Class purchased Chocolate at supracompetitive prices established by the actions of Defendants and their unnamed co-conspirators as a result of the restraint of trade alleged herein. Plaintiff and members of the Class have all sustained damage in that they paid artificially inflated prices for the Chocolate products at issue due to Defendants' conduct in violation of the federal antitrust laws as complained of herein.

24. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and antitrust litigation.

25. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants conspired, contracted or combined with others, for the purpose of and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of Chocolate purchased by members of the Class;

(b) Whether Defendants undertook actions to conceal the unlawful conspiracies, contracts or combinations described herein and;

(c) Whether Defendants' conduct violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

26. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.

27. The interest of members of the Class is individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

28. Throughout the Class Period, there has been a continuous and uninterrupted flow of transactions in shipments of Chocolate in interstate and international commerce throughout the United States and the world.

29. The unlawful activities of Defendants and the unnamed co-conspirators have been within the flow of, and have had a direct, substantial, and reasonably foreseeable effect on interstate and international commerce.

## FACTUAL ALLEGATIONS

30. Commencing on or around December 21, 2003, the exact date being unknown, Defendants conspired, contracted or combined among themselves and with others, for the purpose of and with the effect of raising, fixing, pegging, maintaining or stabilizing the price of Chocolate and other commercial conditions for deliveries of Chocolate purchased by the Class.

31. Chocolate is a commodity product that is uniform. It does not vary materially depending upon manufacturer. The Chocolate produced by any Defendant is fungible with any other Defendant's Chocolate.

32. The Chocolate industry in the United States and worldwide is highly concentrated so as to facilitate the coordination of prices of Chocolate.

33. Defendants collectively are the principal manufacturers of Chocolate domestically and worldwide.

34. According to published sources, three Defendant manufacturers represent over 80 percent of the U.S. Chocolate market. Defendant Hershey's market share is estimated at 45 percent, Defendant Mars's market share is estimated at 27 percent, and Defendant Nestle's market share is estimated at 9 percent.

35. Defendants also control one-half of the global Chocolate market. Mars has approximately 15 percent, Nestle has almost 13 percent, Hershey has approximately 8 percent, and Cadbury has approximately 8 percent of this market.

36. According to Packaged Facts, an industry publication, the United States market for Chocolate rose to $16 billion in 2006. Much of that increase in 2006 was achieved through price increases rather than increased unit sales.

37. In the face of rising costs, Defendants, as the dominant players in the U.S. Chocolate market, responded, in part, by instituting uniform price increases. In 2003, Hershey, Mars, and Nestle all increased their prices in the United States by approximately ten percent. Cadbury also increased its prices in early 2003 and reported that its price increase "held" and did not diminish customer demand.

38. These United States price increases went into effect at the same time that concerted pricing communications and other anticompetitive conduct took place in Canada.

39. In late March of 2007, Masterfoods increased wholesale prices of well-known Chocolate bars, such as Snickers, by approximately five percent. The company cited rising costs

as the basis for the price increase. Shortly thereafter, Hershey increased its prices by the same amount, also citing the need to help offset costs.

40. Contrary to the expected decline that would normally follow a price increase under competitive conditions, Hershey announced that it expected the price increase to have "minimal financial impact." Prudential analyst John M. McMillin agreed with that forecast, explaining that Cadbury and Masterfoods also increased prices, "so Hershey is not out there alone, we think, in this chocolate [price increase]."

41. This and other price increases by Defendants during the Class Period were made pursuant to the unlawful price fixing conspiracy alleged herein.

42. Defendants also frequently met among themselves and, thus, had an opportunity to conspire. Defendants are members of the Chocolate Manufacturers Association ("CMA") and the National Confectioners Association ("NCA"), which sponsored meetings that Defendants attended during the Class Period. The CMA, headquartered in Vienna, Virginia, has served as the premier trade group for manufacturers and distributors of cocoa and chocolate products in the United States. CMA members produce over 90 percent of the Chocolate processed in the United States. The NCA is a trade association that represents the entire confection industry. It is one of the oldest trade associations in the world.

43. In July 2007, Canada's Competition Bureau ("the Bureau") initiated an investigation into the Chocolate market based on information provided by a "Cooperating Company" involved in the conspiracy.

44. According to news reports, Defendant Cadbury is believed to be the Cooperating Company that turned evidence over to the Bureau and is cooperating with cartel investigators, as Cadbury is not named as one of the companies under investigation. Canada is one of the few

countries with a "leniency program," where the first member of a cartel to blow the whistle gets lighter treatment.

46. On November 21, 2007, Ontario's Superior Court issued search warrants to Canada's Competition Bureau (the "Bureau") to investigate a scheme to fix the prices of Chocolate among Hershey, Mars, Nestle, and Cadbury. The Court stated that it was granting search warrants "based on evidence that there are reasonable grounds to believe that a number of suppliers in the chocolate confectionery industry have engaged in activities contrary to the conspiracy provisions of the Competition Act."

46. The search warrants required Defendants to surrender reams of documents that pertain to their Chocolate pricing arrangements.

47. Nestle, Cadbury, and Hershey have each publicly admitted that the Bureau has contacted them in connection with an investigation of unlawful conduct; Hershey confirmed that the Bureau contacted it on November 26, 2007.

48. According to John Pecman, the Bureau's Assistant Deputy Commissioner in the Criminal Division, the Bureau "can confirm that [it is] investigating alleged anticompetitive practices in the chocolate confectionery industry," and that "the volume of commerce affected [] is definitely potentially in the billions of dollars per year."

49. According to documents unsealed in December 2007 by the Ontario Superior Court (the "Affidavits"), senior executives at Hershey's, Mars, Nestle, and other companies met secretly in coffee shops, restaurants and at industry conventions to set prices paid for Chocolate since February 2002.

50. According to the Affidavits, a lunch meeting took place at the Auberge de Pommier restaurant in Toronto, Canada on July 4, 2007, during which price increases were discussed and coordinated. During the meeting, the President of Nestle Canada's confectionery

business, Sandra Martinez de Arevalo, suggested that Cooperating Company lead a price increase in 2007, and that Nestle would take the price increase in the third quarter. The Cooperating Company's unidentified witness said that he/she responded that they may not be prepared to take a price increase in 2007, but might be prepared to take one in 2008, and further said that they would follow but would not lead a Chocolate price increase.

51. The Affidavits further reveal that Bert Alfonso, then senior vice president and Chief Financial Officer of The Hershey Company, sent the following email on January 3, 2007, to an unnamed "Cooperating Individual" and Eric Lent of The Hershey Company in Canada:

> As we discussed, Hershey has recently appointed Eric Lent as VP/GM for the Canada business. In keeping with the good advice from 'The Godfather', keep close to your competition, I am including contact info below in an effort to introduce you both. All kidding aside, I know Eric is looking forward to meeting you.

52. Mr. Alfonso joined The Hershey Company in July 2006 from Cadbury Schweppes, where he was Executive Vice President Finance and Chief Financial Officer, Americas Beverages and was responsible for leading all finance and information technology functions for the United States, Canada, Mexico and the Caribbean region. The Cooperating Individual to whom Mr. Alfonso sent his email was likely from Cadbury. In July 2007, the Bureau initiated its investigation based on information provided by a cooperating company involved in the conspiracy.

53. According to news reports, accusations similar to those made in Canada have been made in the United States. On December 20, 2007, the U.S. Department of Justice's ("DOJ") antitrust division began its own inquiry into Defendants' unlawful pricing practices in the United States Chocolate market.

54. That same day, Mars's spokeswoman, Alice Nathanson, reported that it was contacted by the DOJ about the company's alleged anticompetitive pricing practices in the U.S. Chocolate confectionery industry. Hershey and Mars are based in the United States and control their Canadian and United States operations and subsidiaries from centralized top management in the United States.

55. On December 20, 2007, a Nestle spokeswoman, Laurie MacDonald, also acknowledged the DOJ's antitrust investigation of Nestle's pricing practices.

56. In January 2008, the European Commission ("EC") initiated an investigation into an industry-wide price-fixing scheme among chocolate manufacturers.

57. On February 11, 2008, the German Federal Cartel Office raided seven candy and chocolate makers, including Mars and Nestle, with respect to a conspiracy to fix prices.

**ALLEGATION OF ANTITRUST INJURY
TO PLAINTIFF AND THE CLASS**

58. The combination and conspiracy alleged herein had and is having the following effects, among others:

(a) prices charged to Plaintiff and the Class for Chocolate have been fixed or stabilized at higher, artificially derived, noncompetitive levels;

(b) Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Chocolate; and

(c) competition in establishing the prices paid in the United States and worldwide for Chocolate has been unlawfully restrained, suppressed and eliminated.

59. By reason of the violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act, Plaintiff and the Class have sustained injury to their business or property. The injury sustained by Plaintiff and the Class is the payment of supracompetitive prices for Chocolate as a result of Defendants' illegal contract, combination, and conspiracy to restrain

trade as alleged. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## FRAUDULENT CONCEALMENT

60. Defendants fraudulently concealed their participation in the conspiracy alleged herein by, *inter alia*, engaging in secret meetings and communications in furtherance of the conspiracy, and by holding themselves out as competitors to the public, to Plaintiff, and to the Class. Because of such fraudulent concealment, and the fact that a price fixing conspiracy is inherently self-concealing, Plaintiff and the Class could not have discovered the existence of this conspiracy any earlier than its public disclosure.

## COUNT I

### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT AND SECTION 4 OF THE CLAYTON ACT

61. Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

62. Defendants and the named co-conspirators entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

63. The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, and standardized prices for Chocolate. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

64. Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements by, between,

and among Defendants and the co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

65. The contract, combination or conspiracy has had the following effects:

(a) prices charged to Plaintiff and the Class for Chocolate were fixed or stabilized at higher, artificially derived, noncompetitive levels;

(b) Plaintiff and the Class have been deprived of the benefits of free, open and unrestricted competition in the market for Chocolate; and

(c) competition in establishing the prices paid, customers of, and territories for transportation services of Chocolate has been unlawfully restrained, suppressed and eliminated.

66. As a proximate result of Defendants' unlawful conduct, Plaintiff and the Class have suffered injury in that they have paid supracompetitive prices for Chocolate.

## DEMAND FOR JURY TRIAL

67. Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representatives and that Plaintiff's counsel be appointed as counsel for the Class;

B. That the unlawful contract, combination and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act and that such unlawful conduct be enjoined hereunder;

C. That Plaintiff and Class recover compensatory damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiff and each and every member of the Class;

D. That Plaintiff and the Class recover treble damages, as provided by law;

E. That Plaintiff and the Class recover their costs of the suit, including attorney's fees, as provided by law; and

F. For such further relief as the Court may deem just and proper.

Dated: March 14, 2008.

Respectfully submitted,

**SUSMAN GODFREY L.L.P.**

s/ Barry C. Barnett
Barry C. Barnett
Lead Attorney
Texas State Bar No. 01778700
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone: 214-754-1900
Facsimile: 214-754-1933

Rachel S. Black
Washington State Bar No. 32204
1201 Third Ave., Suite 3800
Seattle, WA 98105
Telephone: 206-516-3800
Facsimile: 206-516-3883

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jeffrey S. Abraham
New York State Bar No. 2333730
Arthur J. Chen
New York State Bar No. 4372900
One Penn Plaza, Suite 2805
New York, NY 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

**ATTORNEYS FOR PLAINTIFF**